UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL ABRAMSON | No. 18 CR 681<br><br>Judge Virginia M. Kendall |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, submits the following response to defendant Michael Abramson's Motion for Judgment of Acquittal, (R. 162), and respectfully requests that the Court deny defendant's motion.

**I.     PROCEDURAL POSTURE**

The indictment charged defendant Michael Abramson with thirteen counts of false statements in corporate and individual tax filings, in violation of Title 26, United States Code, Section 7206(1).  R. 1.  These false statements relate to over $1 million of dollars of payments from defendant to his mistress, Jerilyn Totani, through one of his companies, Eastern Advisors.  The false statements enabled defendant to take unwarranted corporate tax deductions and disguise gift payments to Totani as loans to avoid additional taxable income on his tax returns.

A jury trial began on January 30, 2023.  R. 146.  Following the close of the government's case-in-chief, on February 6, 2023, defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) as to certain counts of the indictment, which the Court denied. R. 164 ("Tr.") at 936.  On February 10, 2023, the

jury reported that it failed to reach a unanimous verdict, and the Court declared a mistrial. R. 154. On March 24, 2023, defendant filed the present motion for judgment of acquittal under Rule 29(c)(2). R 162.

## II. TRIAL TESTIMONY AND EVIDENCE

*Extramarital Relationship of Defendant and Totani*

At trial, the government introduced evidence establishing that, between the mid-1990s and at least 2014, defendant was engaged in a secretive extramarital relationship with Jerilyn Totani. Totani testified that, while she working as a dancer at a strip club in the Chicago area, she began a friendship with defendant (who worked in some capacity at the club) and soon after began a romantic and sexual relationship. Tr. 245-47. Totani acknowledged that she knew defendant was married and that defendant would not be leaving his wife. Tr. 246. Starting in the mid-1990s, defendant began to financially support Totani, providing her with several hundred dollars a week. Totani then told defendant that she would like him to financially take care of her. Tr. at 250. Totani, who had been living with her parents, told defendant that she wanted to move closer to him in Chicago and found an apartment at 1122 North Clark Street, in Chicago. Tr. at 251. Rent for the apartment was $1,200 a month and defendant paid for it. Tr. at 252. Around that time, defendant continued to make weekly payments of $500 to Totani, which he left on the counter in her apartment. Tr. at 257.

The apartment building converted to condominiums and defendant purchased Totani's unit. Tr. at 265. Richard Forcone, a former business acquaintance of defendant, testified that, in or around 1998 or 1999, defendant asked him to put a

condominium in Chicago in Forcone's name. Tr. at 226. Defendant told Forcone that he had a girlfriend (Totani) living there, and he did not want his wife to know about the apartment, so he did not want the apartment on his taxes. Tr. at 227. By that time, defendant and Forcone were not particularly close, having met on approximately five occasions. Tr. at 224. Forcone testified that he never socialized with defendant. Tr. at 224.

The government introduced evidence corroborating Forcone's testimony and reflecting defendant's efforts to conceal his connection to Totani and the condominium. Specifically, the government introduced a land trust agreement and other paperwork related to the condominium, which reflected that defendant put the land trust in Forcone's name from 1999 through 2005. Tr. at 214-15. Defendant became the beneficiary for an approximately seven-month period, during which time he obtained a second mortgage on the condominium, before Benjamin Olsen became the beneficiary, with defendant maintaining power of direction. Tr. at 216.

Totani testified that defendant showed her a life insurance policy for defendant for Totani's benefit in the amount of $1 million, which Totani asked defendant to increase to $5 million. Tr. 269. Defendant leased or purchased Totani several luxury vehicles, including the shell of a 1974 Corvette, a 1998 Corvette (which was shipped directly to Las Vegas and cost approximately $28,500), a 1995 Corvette, a Ferrari (for which Totani obtained a vanity license plate in the name "Herrari," and which had a sticker price of $107,000), and a Porsche 911 C2. Tr. 269, 270, 272, 281, 286. Totani testified that, while she picked up the Porsche, she saw a motorcycle that she wanted

3

and called defendant, and defendant purchased it for her. Tr. 283. Totani testified that she sold some of the vehicles defendant had purchased for her and gambled the money away. Tr. 286-87.

*Outfront Deal*

Ronald Ipjian, the former Central Regional Manager and General Manager of Chicago of Outfront, testified about his dealings with defendant, Eastern Advisors, and an agreement with the Village of Rosemont. Specifically, Ipjian testified that he and Outfront retained defendant in the early 2000s to assist Outfront in its dealings with the Village of Rosemont. Around that time, the Village of Rosemont was seeking to terminate Outfront's lease of billboards and take the structures, which Outfront owned. Tr. 341-42. Outfront looked for local legal assistance and retained defendant. Tr. 343. Ipjian had no recollection of defendant soliciting Outfront's business but recalled considering multiple attorneys. Tr. 343. After brief consideration of a lawsuit, Outfront began working with a consultant, Robert Durkin, to negotiate a resolution with the Village of Rosemont (the "Rosemont Billboards Deal"). Tr. 344-45. Neither defendant nor Totani were involved in the negotiations, and Ipjian dealt only with Durkin thereafter. Tr. 347-48. Outfront entered into an agreement with Eastern Advisors, with whom Durkin was associated, to pay Eastern Advisors a percentage of the advertising revenue related to the billboards in question with a minimum payment set by agreement. Tr. 349.

Kathryn Graham, a former real estate assistant at Outfront, testified about her work with Mitchell Matson, the Real Estate Director, and her work in connection

4

with Eastern Advisors. Graham testified that she generated checks to Eastern Advisors in connection with an agreement between Outfront and Eastern Advisors. Tr. 361. Approximately once a quarter, for nearly ten years, Durkin came to Outfront's offices, and Graham spoke with him. Tr. 362. Graham caused the payments to be sent out to Eastern Advisors on a quarterly basis along with a letter, which was always addressed to Durkin. R. 366. Graham did not recognize defendant or Totani and never dealt with them. Tr. 371. Between the period of 2006 and 2014, Graham never once received a call from anyone at Eastern Advisors disputing the payment amount from Outfront. Tr. 391.

Once the agreement between Outfront and the Village of Rosemont was reached, there was nothing for Eastern Advisors to do with regard to the deal except relationship maintenance, which Durkin handled, and collect payments, which were addressed to Durkin. Totani also testified that, during the relevant time period (2003 to 2014), she spent months at a time in Las Vegas. Tr. 268, 285-86.

*Payments from Eastern Advisors to Totani*

The government introduced evidence establishing that defendant, by way of Eastern Advisors, paid Totani's credit card bills between 2006 and 2014. Tr. 289 and 421-22. The credit card bills, a selection of which were published to the jury, reflected payments for travel to the Virgin Islands, California, and Las Vegas for Totani and an individual named Jamie Mika, stays at resorts and hotels, spa treatments, restaurants, and shopping excursions. Tr. 289-99. Defendant caused his bookkeeper, Jill Roth, to book payments for Totani's credit card bills and other expenses, including

5

medical expenses and payments for Totani's living situation, into a loan account entitled "JT Loan." Tr. 421-22.

Roth testified that, between 2008 and 2014, Eastern Advisors issued bi-weekly payments of $2,500 to Totani at defendant's direction, which payments were booked as "advance on commissions." Tr. 401-02. Roth was not aware of what, if any, work Totani did or had done to earn those payments. Tr. 402. Roth also testified that Durkin received commissions payments throughout the same time period. Tr. 403. Unlike Totani, Durkin did not receive advances on commissions payments and was only paid upon receipt of money from Outfront. Tr. 403-04.

*Eastern Advisors Non-Filing and Tax Inquiries About Eastern Advisors*

The government introduced evidence that Eastern Advisors did not file tax returns with the IRS between 2003 and 2013. Tr. 81. In or around April 2013, the IRS began making inquiries into a company affiliated with defendant (Grupo Mexquitic), which was located in Mexico. Tr. 80. As part of that inquiry, the IRS worked with Mexican tax authorities to request documentation from Grupo related to Eastern Advisors and the flow of funds from Eastern Advisors to Grupo. Tr. 80.

*2014 Recharacterizations and Preparation of Amended Corporate Tax Returns*

Roth testified that, around 2014, for the first time, defendant asked her to prepare corporate tax returns for his entities. Tr. 434-35. Roth was not and had never been a tax preparer and by that time, defendant had used Krol & Associates to prepare his corporate and personal income tax returns for nearly two decades. Tr. 434-35, 1006. In 2014, for the first time, defendant caused Roth to issue Form 1099s

6

to individuals paid by Eastern Advisors, including Totani. Tr. 431, 433-34. In March 2014, for the first time, defendant caused Roth to recharacterize the advance on commissions payments as commissions and move certain payments booked as advance on commissions to a loan account called "JT Loan" in the Eastern Advisors QuickBooks. Tr. 404.

*Defendant's Tax Preparers*

The government called two tax preparers from Krol & Associates, who testified about their preparation of corporate and amended corporate tax returns for Leasing Employment Services and defendant personally. Specifically, Gregg Szulczynski and Mark Halloran testified about their reliance on the accuracy of the information provided by defendant and Eastern Advisors in preparing the tax returns in question. Tr. 478, 660, 641. Szulczynski further testified that the first time he learned about the JT Loan account in Eastern Advisors QuickBooks was in 2014. Tr. 637. Szulczynski also testified that defendant told him that the QuickBooks were correct and that the loans listed in the QuickBooks were "good." Tr. 638, 654.

During his presentation of evidence, defendant called Jeffrey Krol, the owner of the tax preparation company that defendant used to prepare the charged tax returns. Krol testified that he and the tax preparers at Krol & Associates relied on the information that defendant provided to prepare the returns in question. Tr. 1007. Krol testified that did not know what the entry "Loan Receivable-JT" on the corporate tax returns referenced. Tr. 1011-12.

7

*Totani's Testimony as Defense Witness*

Totani testified twice during the course of the trial, each time over a two-day period. The second time, she was called by defendant and testified about the commissions payments she received from Eastern Advisors. Totani testified that she earned the commissions payments through: (1) passing along information that she had overheard about issues relating to the Village of Rosemont and billboards at a bowling alley in or around 2001 to defendant; and (2) taking photographs of the billboards between 2004 and 2014 as part of a "proof of performance" practice at Eastern Advisors. Tr. 1067-68, 1074. The jury later heard that Totani told the grand jury in 2018 that the information she purportedly relayed to defendant was provided by Norean Mitchell, an employee at Outfront, but at trial, Totani said the information came from someone else talking to Mitchell. Tr. 1067, 1411. The jury also heard that Totani only located photographs of the billboards starting in December 2014. Totani testified that she had "deleted" all of the emails reflecting the photographs she took and sent to defendant from 2004 through November 2014. Tr. 1206-07.

### III. ARGUMENT

#### A. Legal Standard for Judgment of Acquittal

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict against a defendant. Fed. R. Crim. P. 29. In applying Rule 29, courts must view the evidence "in the light most favorable to the government," and drawing all reasonable inferences in the government's favor." *United States v. Fitzpatrick*, No. 22-2549, 2023 WL 1962644, at *2 (7th Cir. Feb. 13, 2023) (internal quotation marks omitted). That same standard applies to a guilty verdict and where

8

a jury is unable to reach a verdict. *United States v. Patel*, No. 01 CR 716, 2002 WL 31236298, at *2 (N.D. Ill. Oct. 3, 2002) ("Although the jury failed to return a unanimous verdict, viewing the evidence in favor of the Government . . . ."). "Such a challenge leads to a reversal only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (internal citation and quotation marks omitted).

> **B.** **The Evidence Presented At Trial Was Sufficient To Sustain a Conviction on Each Count**

Counts One through Thirteen of the indictment charged defendant with making false statements in corporate and personal tax returns. R. 1. To establish that defendant was guilty of making false statements in tax returns beyond a reasonable doubt, the government was required to show that: (1) the defendant prepared an income tax return or caused someone to prepare an income tax return; (2) the income tax return was false as to a material matter, as charged in the Count; (3) the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury; (4) the defendant acted willfully, that is, he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe that it was truthful as to a material matter; and (5) the defendant filed the income tax return with the Internal Revenue Service. *United States v. Pree*, 408 F.3d 855, 857 (7th Cir. 2005). Defendant contends that there was insufficient evidence as to the second and fourth elements, but the evidence was more than sufficient to establish each element of the offense beyond a reasonable doubt.

9

1. **The Evidence Demonstrated That Defendant Filed or Caused to be Filed Tax Returns Containing Material False Statements.**

The government's evidence established that each of the income tax returns charged in the indictment – Leasing Employment Services's original and amended corporate tax returns for 2006 through 2014 and defendant's personal income tax returns for 2011 through 2014 – were false as to a material matter. The indictment alleged that the original and amended corporate returns were false in either of two ways: first, the line item "Total Deductions" included deductions for commissions payments made to Totani between 2006 and 2014; and second, Schedule L, Line 14 reflected the "JT Loan" as a loan receivable or asset for Eastern Advisors. The indictment also alleged that defendant's personal income tax returns were false with regard to "Total Income." The evidence introduced at trial established the falsity of the charged statements.

The evidence established that Totani had nothing to do with the Rosemont Billboards Deal and did not earn the commissions payments. Totani was defendant's girlfriend whom he paid using Eastern Advisors. Ipjian testified that the deal came together through retaining defendant as an attorney and then working with Durkin to negotiate a resolution. Graham testified that, as part of the payment and relationship maintenance process thereafter, she only ever dealt with Durkin. Every payment by Outfront was directed to Durkin.

Totani was the only witness to testify about her involvement in the deal, and her testimony was not credible. As discussed above, Totani's story regarding overhearing a conversation in a bowling alley in the early 2000s, while inherently

10

implausible, also differed significantly from sworn testimony she gave to the grand jury in 2018. The evidence also established that, to the extent Totani ever photographed the billboards, such photographs began in December 2014, which was after defendant learned that he was under investigation and had filed the amended tax returns for Leasing Employment Services.

Defendant's argument boils down to a contention that the government failed to sufficiently prove a negative—i.e., Totani's lack of work. R. 162 at 8-9. But the only evidence of any work performed by Totani came *from Totani*, who acknowledged her bias toward defendant, financial dependence upon defendant, and even her willingness to die for defendant.

The false statements regarding the deductions based on the commissions payments to Totani were plainly material as to the corporate and individual tax returns. The deductions were improper and impacted: (i) the total income of Leasing Employment Services; (ii) the distributions that defendant would have received from Eastern Advisors as a shareholder of Eastern Advisors; and (iii) defendant's total income on his personal income tax returns. Revenue Agent Michael Welch introduced approximately 75 pages of charts and summary tables reflecting the tax deficiency, both corporate and personal, resulting from the improper deduction of the commissions payments to Totani by Leasing Employment Services.

Similarly, the evidence at trial showed that the payments booked in the "JT Loan" account and listed as a "loan receivable" and asset on the books of Eastern Advisors were not loans. These payments, which included payments for Totani's

credit cards, medical bills, and apartment expenses, were personal expenses and Totani testified that she did not understand them to be a loan that she was expected to repay. Not a single witness testified that the "JT Loan" account was a loan anyone was expected to repay, nor was there a single piece of evidence reflecting that the "JT Loan" was a legitimate loan—there was no loan agreement, no interest rate, no repayment schedule, no repayments, nor was there any effort to collect on the loan.

Regarding materiality, as the Court appropriately instructed the jury, the government need not prove a tax deficiency to establish the materiality of a false statement, and "[a] false statement is 'material' when it has the potential for hindering the IRS's efforts to monitor and verify the tax liability of the corporation and the taxpayer." *United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998) (citing *United States v. Minneman*, 143 F.3d 274, 279 (7th Cir. 1998)). Revenue Agent Welch testified that if the payments booked as loans were distributions and not loans, they would have had the potential to be taxable as a dividend, which would impact defendant's total income. Tr. 820. Thus, false statements regarding the "JT Loans" in Schedule L, Line 14 could have hindered the IRS's effort to monitor and verify the tax liability of defendant on his personal income tax returns. Accordingly, the false statements regarding the "JT Loan" account receivable in "other assets" on Schedule L, Line 14 of the original and amended corporate tax returns were material.

### 2. The Evidence Demonstrated That Defendant Acted Willfully.

The government's evidence also established that defendant acted willfully when he signed the relevant tax returns. That is, that defendant knew that he had

12

a legal duty to file a truthful tax return, but when he signed each corporate and individual tax return, he did not believe that it was truthful as to a material matter.

The government's evidence established that defendant was sophisticated and knowledgeable and was aware of his duty to file truthful tax returns. Defendant was a partner at a law firm, Arnstein & Lehr LLP, who, at one time, was admitted to the U.S. Tax Court and handled a case. Tr. 100. Moreover, the language of each of the applicable returns clearly communicated to defendant his legal obligation to submit truthful tax returns. The government introduced defendant's personal income tax returns for 2011 through 2014 and introduced the IRS Form 8879s that defendant signed in connection with Krol & Associates' filing of certain of defendant's personal income tax returns. Each contained a jurat. The government published to the jury the jurat from the personal income tax returns and amended corporate tax returns, which provided that defendant had "examined" the applicable return and, "under penalties of perjury," declared that it was "true, correct, and complete." Tr. 89, 94.

The government's evidence, summarized above, established beyond a reasonable doubt that defendant did not believe that the information contained in the corporate and individual tax returns were truthful as to a material matter. Defendant knew that he was retained by the Outfront independent of any action by Totani. As she testified in the grand jury (and inconsistently with her trial testimony), Totani needed to be reminded by defendant in 2016 about bringing the Rosemont Billboards Deal after she was approached by the FBI.

13

Defendant also knew that Totani was not photographing the billboards between 2004 and November 2014. Although Totani testified that she took photographs of the billboards for over a decade at defendant's direction, she was only able to find photographs beginning in December 2014, which was after defendant: (1) became aware tax authorities had made inquiries about Eastern Advisors; (2) requested, for the first time, that Roth complete the amended corporate tax returns for Leasing Employment Services to include Eastern Advisors and that Roth issue a Form 1099 to Totani; (3) had Roth recharacterize payments made to Totani by Eastern Advisors as "commission" payments rather than "advance on commissions" and change the "JT Loan" account for prior years based on those recharacterizations; (4) filed the amended corporate tax returns for Leasing Employment Services to include Eastern Advisors; and (5) told Totani she had to start taking pictures of the billboard more often "*because of the investigation*," (Tr. 1212) (emphasis added).

With regard to payments booked under the "JT Loan" account, the evidence established that defendant caused Eastern Advisors to make payments in the amount of approximately $775,000 for Totani's benefit between 2006 and 2014, which defendant caused Roth to book as loan payments. Defendant knew that there was no loan agreement (with Totani or anyone), no interest rate, no promissory note, no repayment schedule, no evidence of repayments, and no efforts made to collect upon the loan. Contrary to defendant's argument, not a single fact witness testified that the "JT Loan" account was a related-party loan made to defendant from Eastern Advisors for the benefit of Totani. Instead, defendant's paid expert, Ron Braver,

testified as such based on his "experience and education." Tr. 1265. In addition, defendant's ability to "cover the JT Loan" with money he purportedly put into Eastern Advisors, (R. 162 at 1), did not make the original and corporate amended tax returns accurate with regard to the JT Loan entries.

That defendant "disclosed" the false information to his tax preparers, (R. 162 at 15), means neither that the information that was disclosed was true nor that defendant believed it to be true. Instead, the "disclosure," i.e., the provision of the Eastern Advisors QuickBooks containing the false information, was a necessary step to file tax returns encompassing Eastern Advisors. Those filings, which occurred for the first time in 2014 after over a decade of causing payments to or for the benefit of Totani from Eastern Advisors, only occurred *after* defendant learned tax authorities were inquiring about Eastern Advisors.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's Motion for Judgment of Acquittal.

Dated: April 18, 2023 

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By: */s/ Richard M. Rothblatt*
RICHARD M. ROTHBLATT
MISTY N. WRIGHT
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

15